**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>TYRELL M COLE | CASE NO. 1:24-CR-13-HAB-ALT |

**OPINION AND ORDER**

A grand jury indicted Tyrell M. Cole ("Cole") on two violations of 18 U.S.C. §922(g), one for being a felon in possession of a firearm and ammunition (Count 1) and the other for possession of a firearm and ammunition by a person convicted of a misdemeanor crime of domestic violence (Count 2). Cole pleaded guilty to Count 1 without a plea agreement.[1] Subsequently, an officer from the U.S. Probation and Pretrial Services Office prepared and filed a draft presentence investigation report ("PSR"), followed by a revised draft that addressed objections by the Government. (ECF Nos. 61, 68). The revised draft included an adjustment for obstruction of justice pursuant to USSG §3C1.1 and a five-level enhancement pursuant to USSG §2D2.1(b)(5)(C)[2], which was omitted in the original draft. Cole objected to these additions to the revised draft and requested an evidentiary hearing. (ECF No. 69). Probation subsequently filed a

[1] The Government moved to dismiss Count 2, which remains pending. (ECF No. 59).

[2] The firearms trafficking enhancement was amended in 2025, moving the text of the guideline one subsection from U.S.S.G. § 2K2.1(b)(5)(C) to (b)(6)(C). *See* U.S.S.G. § 2K2.1(b)(6)(C) (2025) ("If the defendant (C)(i) transported ... or otherwise disposed of ... two or more firearms *knowing or having reason to believe* that such conduct would result in the receipt of the firearms by an individual who (I) had a prior conviction for a crime of violence, controlled substance offense, or misdemeanor crime of domestic violence; (II) was under a criminal justice sentence ... or (III) intended to use or dispose of the firearm or ammunition unlawfully ... increase by 5 levels[.]"(emphasis added)). The Court has also reviewed the 2026 Guidelines and no changes were made to this section in those Guidelines.

Final PSR and addendum, with both enhancements included. (ECF Nos. 71, 72). The Court held an evidentiary hearing on Cole's objection (Evid. Hrg. Tr., ECF No. 83) and ordered briefing which the Court has now received. (ECF Nos. 89, 92, 93). Because the Court finds that the Government meets its burden, the Court OVERRULES the Defendant's objection to the five-level enhancement under U.S.S.G. §2K2.1(b)(6)(C). Likewise, because the Court finds that Cole obstructed justice, the Court OVERRULES the Defendant's objection to that enhancement.

## DISCUSSION

The Final PSR assessed Cole a base offense level of 20 after determining that the offense involved a semiautomatic firearm that is capable of accepting a large capacity magazine and the defendant was a prohibited person at the time the defendant committed the instant offense. (Final PSR ¶ 37). The officer then increased that offense level by nine levels: two levels because the offense involved 3-7 firearms, *see* §2K2.1(b)(1)(A); five levels because of the firearms trafficking enhancement in U.S.S.G. §2K2.1(b)(5)(C) (now (6)(C)); and two levels for obstruction of justice. After application of enhancements, Cole's adjusted offense level was 29. Cole then received a two-level reduction for acceptance of responsibility, U.S.S.G. §3E1.1(a), and an additional one level under U.S.S.G. §3E1.1(b) because Cole assisted authorities in the investigation or prosecution of his own misconduct. (Final PSR ¶¶ 77, 78). All this yielded a total offense level of 26. With Cole's criminal history category of V, he faces a guidelines range of 110 to 137 months.

Cole's objections relate to the five-level enhancement for his role in the offense and the two-level obstruction of justice enhancement. After a review of the facts in the PSR and testimony elicited at the evidentiary hearing, the Court will address the parties' arguments.

### A. Factual Background

On April 26, 2024, the Fort Wayne Police Department ("FWPD") received a call from a concerned individual that Cole, a felon, was at Freedom Firearms on Director's Row in Fort Wayne. (PSR ¶ 1). Officers confirmed that Cole was a felon before contacting Freedom Firearms and speaking to management. Upon contact with Freedom Firearms, FWPD Detective Foote ("Det. Foote") learned that Cole was actively using the gun range. He was joined by a female, identified as Lorraina Rakes ("Rakes"), and a small child, later identified as 4 yr. old Latrell Cole. Latrell is the child of Rakes and Cole.

Det. Foote observed Cole exit the gun store with a backpack believed to contain firearms and walk to a Jeep in the parking lot. As he left the parking lot, officers stopped him. Inside his vehicle were three firearms: a Ruger, LCP Max 30 ("Ruger"); a Glock 19x, 9mm ("Glock"); and a FN Reflex, 9mm ("Reflex"). Also inside the vehicle was a 33 round magazine containing ammunition along with a separate full 50-count box of ammunition.

Records reflect that all 3 firearms and the ammunition were purchased by Rakes. She purchased the Ruger on October 7, 2022, from Allan's Jewelry & Loan, Inc., the Glock from Freedom Firearms on April 9, 2024, and the Reflex and ammunition from Allan's Jewelry & Loan, Inc. on April 22, 2024 (Gov't Ex. 8). The Government charged Rakes in a separate, but related criminal case, *United States v. Rakes*, 1:24-CR-18, with transferring or disposing of a firearm to a prohibited person, 18 U.S.C. § 922(d)(1). The prohibited person in that proceeding was Cole.[3] (Rakes PSR ¶¶ 35-38). Rakes pleaded guilty to the charge and received a 36-month term of imprisonment followed by 3 years of supervised release.

---

[3] The Court takes judicial notice of the Presentence Investigation Report ("Rakes PSR") (ECF No. 45) in Rakes' case as it contains additional facts from which the Court can draw inferences. See Fed. R. Evid. 201 (court can take judicial notice of adjudicative facts that are not subject to reasonable dispute); *see United States v. Castelli*, 550 F. App'x 91, 94 (3d Cir. 2014) (stating "as the District Court correctly noted, it could take judicial notice of [information contained in a PSR]"); *United States v. Moore*, 2025 WL 2345226, at *2 (S.D. Cal. Aug. 13, 2025). The facts set forth in Rakes' PSR were not in dispute or the subject of objection by Rakes.

**1. Glock Purchase**

At the evidentiary hearing, the Government presented text messages downloaded from Cole's cell phone. (Evid Hr'g Tr. at 22). Those messages reflect a text exchange between Cole and Rakes on April 9, 2024, the day Rakes purchased the Glock from Freedom Firearms and two weeks prior to Cole's arrest. (Gov't Exs. 6, 7). In that exchange, Rakes sent a photo to Cole of several firearms with the price tags exposed asking Cole, "The gold one?" She followed that message with more question marks ("??") to which Cole responded, "Yes." He followed that message with a picture showing a screen shot from freedomfortwayne.com of a tan Glock 19X. Rakes then sent a photo of a tan and black firearm with a price tag exposed. Cole responded, "to[o] big to carry." Rakes sent another photo of a firearm to which Cole responded, "Yea." Finally, Rakes sent a photo of a black firearm with a price tag to which Cole responded by "loving" the image and typing, "That's the one." Rakes sent another picture image of three firearms – a pink one, a tan one, and a purple one – with price tags. Rakes texted, "No it's not that one is used." The Government believes Rakes was responding to Cole's message "that's the one." She then texted, "I didn't get that one I got the one you sent to me. The picture." Cole responded to the photo of the three firearms saying, "These cute" to which Rakes responded, "Why you change your mind?" Cole replied, "No."

The Government also submitted evidence from Cole's phone that he conducted Safari searches, including searches for: Freedom Firearms; best glock; best glock for concealed carry; glock 43x, what glock does the military use; what glock does military use M17; what glock does military use 202. (Gov't Exs. 82, 83; Evid. Hr'g Tr. 29).

**2. Reflex and Ammunition Purchase**

The Government offered videos and still photographs from Rakes's purchase of the Reflex at Allen's Jewelry and Loan on April 22, 2024, 4 days prior to Cole's arrest. (Video at Gov't Exs. 12, 13). The Court has reviewed the video footage and summarizes it as follows:

Rakes and Cole approached the counter and Rakes spoke to an employee. The video does not contain audio, so the Court is unaware of what was communicated to the employee. After two minutes or so, Rakes, with cash in hand, gives the cash to the employee. The employee hands Rakes an envelope. While that transaction is taking place, Cole is looking at firearms in the case. More time elapses and Rakes returns to the counter and speaks with another employee. Cole approaches and points to a firearm. (Gov't Ex. 14). Rakes points to the same firearm and the employee removes the firearm from the case and hands it to Rakes. Meanwhile, Cole walks away, briefly looks at a high-capacity magazine, and returns to Rakes. Rakes appears to have difficulty loading the firearm with the high-capacity magazine. Rakes hands the firearm to Cole, who holds and examines it, until Rakes takes it back. Rakes then begins completing the firearms transaction record ATF Form 4473. Cole walks away and returns with an item. He places the item, which the Government believes to be a photo identification, on the counter in front of Rakes. Rakes picks up the item and hands it to the employee. Employees are observed transferring information to the 4473 Form. A short period of time transpires where both Cole and Rakes are out of camera range. Eventually, Rakes returns to presumably finish completing paperwork. After doing so, she walks out of camera range towards where Cole was last seen on camera. Less than 30 seconds later, Rakes returns to the counter with cash in hand and provides it to the employee.

The Government provided a copy of the bill of sale reflecting that the Reflex cost $481.45 and the high-capacity magazine cost $42.75. (Gov't Exs. 8, 9). The Government also admitted the 4473 Form, which indicated that Rakes provided an Indiana identification card for the purchase.

A search of Cole's phone revealed searches for gun ranges and gun shops in Anderson on April 22 and a second search for "gun ranges" in Anderson on April 23, 2024.

**2. <u>Freedom Firearms Range Visit</u>**

As part of the investigation, ATF Task Force Officer Hartman ("TFO Hartman") obtained the range sign-in sheet, purchase receipts, and surveillance video for Cole and Rakes's visit on April 26, 2024. The range sign-in sheet shows that both Cole and Rakes signed in at the same time. (Gov't Ex. 24). Cole's Mastercard account was charged $77.41. (*Id.*). That charge was a NON-paying Range Time for Customer Tyrell Cole and a NON-Member Range Fee, Lane Share Fee, Plugs, Ear/Ete Rental (quantity 5), and two boxes of Sellier & Bellot 9mm bullets for customer Lorraina Rakes. (Gov't Ex. 85).

The Government admitted videos from multiple surveillance cameras (Gov't Exs. 26, 27, 40, 48, and 61) from Freedom Firearms along with still photos from the surveillance cameras. The Court has reviewed this evidence and finds the following occurred:

Cole entered the range area carrying a book bag, (Evid. Tr. 46, Gov't Ex. 25), along with the ammunition purchased and identified in Gov't Ex. 85. Three firearms – the Glock, the Ruger, and the Reflex – are inside the book bag. (Gov't Ex. 26). When the range time is over, Cole packs the firearms and unused ammunition into the book bag. Cole leaves the store carrying the book bag.

The Government admitted video evidence downloaded from Cole's phone. (Gov't Exs. 65-81). According to the Government, these videos purport to show the following:

- Gov't Ex. 65 – Rakes holding and pointing the Ruger
- Gov't Ex. 66 – Cole using the Glock
- Gov't Ex. 67 – Cole holding the Glock with an extended magazine attached
- Gov't Ex. 68 – Cole shooting the Glock with the extended magazine attached
- Gov't Ex. 69 – Cole shooting the Glock
- Gov't Ex. 70 – Ruger and Glock with extended magazine attached

- Gov't Ex. 71 – Rakes shooting the Ruger
- Gov't Ex. 72 – all 3 firearms on a ledge with Cole selecting the Reflex and Glock with extended magazine
- Gov't Ex. 73 – all 3 firearms on a ledge with Rakes selecting the Ruger
- Gov't Ex. 74 – Rakes selecting and shooting the Ruger
- Gov't Ex. 75 – Cole shooting Glock with extended magazine
- Gov't Ex. 76 – Cole shooting Reflex with extended magazine
- Gov't Ex. 77 – all 3 firearms on ledge; Rakes holding a loaded magazine for Ruger
- Gov't Ex. 78 – Rakes shooting Ruger; other 2 firearms on ledge
- Gov't Ex. 79 – same as 78
- Gov't Ex. 80 – Rakes shooting Ruger; Ruger jams; Cole clears the jam and hands back to Rakes; Ruger jams again; Cole takes the Ruger back and shoots it
- Gov't Ex. 81 – Rakes shoots Ruger; Ruger jams. Cole attempts to clear; Rakes seeks employee assistance

Also during their visit at Freedom Firearms, video surveillance cameras depict Cole and Rakes walking through the store looking at and handling firearms. (Gov't Ex. 40). Cole and Rakes are observed pointing to a firearm in a display case. An employee removes a firearm from the case and hands it to Rakes. Cole takes the firearm from Rakes. He handles it, points it, removes the magazine and further examines it. After he inspects it, he hands the firearm back to Rakes.

The two then move to another part of the store where Cole points to rifles and AK pistols on display behind the counter. (Gov't Ex. 47, 48, and 50). An employee hands Rakes an AK pistol. (Gov't Ex. 48). Cole takes the firearm from Rakes and examines the firearm. Cole returns the firearm to the employee.

**3. <u>Jail Calls</u>**

Before the Government adopted Cole's case, he was housed in the Allen County Jail on state charges. While there, Cole placed a call to Rakes. (Def. Ex. F). At one point during the call, Cole tells Rakes, "it shouldn't even be that much of a hard case to beat you know, it's like … it's our shit …[pause] or your shit." (*Id.* at 14:17).

On October 4, 2026, while housed on his federal case at the Corrections Center of Northwest Ohio (CCNO), Cole called Rakes's mother in a video call. Rakes, also housed at CCNO,

made an audio call to her mother at the same time. Rakes's mother put the phone on speaker so Cole and Rakes could speak with each other. During that call, Rakes tells Cole she was charged with disposing of a firearm to a felon. Cole responds telling Rakes that she should just say that she put them in her vehicle "you forgot, that it, case closed." (Def. Ex. G at 12:22). Rakes responds telling Cole that there is evidence of Cole walking out of the store with a bookbag. Cole tells Rakes, "that doesn't mean shit, it could have been anything, a bookbag is just a bookbag."

On October 10, 2024, Cole calls Rakes's mother from CCNO. Rakes calls her mother at the same time. Rakes's mother put the call on speaker phone so that Cole and Rakes can speak with each other. (Gov't Ex. 87). Cole tells Rakes two times that his lawyer is going to be getting in touch with her. At 2:21, he tells Rakes that his lawyer is going to try and find out about Rakes's stolen firearm.

Later in the call, Cole tells Rakes that she should tell the judge that she left those guns in there. At 7:05, Cole again tells Rakes that they said in court "they can't really do shit about it … that she was legal to buy guns." Rakes responds, "I should tell her that I left the guns in the car?" followed by "that don't make it sound good for me. You're trying to get less for yourself and give me all the time." Cole replies, "you're not going to get in trouble you can own one I can't." Rakes tells Cole that she can't lie. Rakes explains that the police officers saw him walk out with the backpack that appears to be heavy and when he was pulled over he had a backpack full of guns. Cole responds "it's your shit." Rakes tells Cole that saying she left the guns in the car would only make her look like a liar. At 8:56 Cole tells Rakes, "You already told them that all that shit was yours in black and white so either way it's just you saying that."

**4. <u>Rakes's Testimony</u>**

Rakes testified at the evidentiary hearing. She recounted that she and Cole met as teenagers, became boyfriend and girlfriend, and subsequently lived together once they were 18. (Evid. Hr'g Tr. at 84). Rakes testified that the two had a tumultuous relationship wherein they would often fight or argue and would separate and then get back together. (*Id.*) That said, the two have a son, Latrell. When Rakes's grandmother passed away, she received an inheritance which she used to purchase a home on Sterling Drive in Fort Wayne. She lived at that residence with Cole and Latrell. (*Id.* at 86-87).

Rakes testified that she purchased all the firearms for herself. (*Id.* at 92). When identifying firearms to purchase, Rakes testified that she asked Cole for advice because he was her "everyday person" and she "relied on him for his knowledge." (*Id.* at 93). When asked to review the videos from the Freedom Firearms store purchase on April 22, she testified that she recalled being there with Cole but Cole did not "direct" the purchase; rather, she testified that she was asking him questions about specific firearms like the firearm's weight, recoil, the kickback and "typical questions about a handgun." (*Id.* at 93). She recalled handing Cole firearms to see if he thought they were too heavy or too light for her. (*Id.* at 94).

Defense counsel also asked Rakes about the text messages between her and Cole on April 9, 2024, the day she purchased the Glock. She again testified that she was asking Cole questions via text message, sending him photos of firearms, and asking him for his opinion on the purchase. (*Id.* at 100). With respect to some of the other text exchanges, she testified that she was taking photos of guns that "looked cool" and "just bullshitting around while I was waiting for my form to get approved." (*Id.* at 101-02).

Rakes testified that she paid cash for the firearms and the cash came from her family, not from Cole. She said that her grandmother supported and spoiled her and so she had cash from her grandmother that she used for the firearms.

With respect to the events at the range, Rakes testified that she and Latrell were running errands and met Cole at the range. She testified that she asked Cole to bring the guns to the range from home. (*Id.* at 104-05). She similarly testified that she gave all three guns to Cole to transport to their home. (*Id.*)

**B. ANALYSIS**

**1. <u>U.S.S.G. §2K2.1(b)(6)(C) (formerly §2K2.1(b)(5)(C))</u>**

Cole challenges the application of a five-level enhancement pursuant to Sentencing Guideline Section 2K2.1(b)(6)(C). Known as the "Trafficking Enhancement," it applies where a defendant:

> (C) (i) transported, transferred, sold, or otherwise disposed of, or purchased or received with intent to transport, transfer, sell, or otherwise dispose of, two or more firearms knowing or having reason to believe that such conduct would result in the receipt of the firearms by an individual who (I) had a prior conviction for a crime of violence, controlled substance offense, or misdemeanor crime of domestic violence; (II) was under a criminal justice sentence at the time of the offense; or (III) intended to use or dispose of the firearms unlawfully; (ii) attempted or conspired to commit the conduct described in clause (i); or (iii) received two or more firearms as a result of inducing the conduct described in clause (i)…

U.S.S.G. §2K2.1(b)(6)(C). In this case, the officer applied the enhancement believing that Cole attempted or conspired with Rakes to commit the conduct described in subsection (i) of the enhancement or that he "induced" the conduct described subsection (i). The Government bears the burden to prove by a preponderance of the evidence that any sentencing enhancement is warranted. *United States v. Hines*, 449 F.3d 808, 815 (7th Cir. 2006).

For its part, the Government argues that Cole both conspired with Rakes for him to transport and possess the firearms and induced Rakes to do so through his influence over her. The Government points to the long relationship between Rakes and Cole along with the text exchanges between the two to show that Cole "wielded substantial influence" over Rakes. The Government notes the interactions between the two at the gun store and asserts that they undoubtedly had an agreement to possess the firearms together at the shooting range. The Government further urges the Court to disregard Rakes' testimony because of the influence Cole has over her and make a finding that she is not credible.

In response, the Defendant hangs his hat on Rakes's credibility and points to all the areas in which her testimony is consistent and truthful. Cole points to facts showing that Rakes was the lawful purchaser of the firearms and the absence of any evidence that Cole induced the purchases or received the firearms. Most significantly, however, he argues that his short-term possession of the firearms – by transport and his use at the range – does not qualify as "disposal of a firearm" for enhancement purposes.

Subsection (i) of §2K2.1(b)(6)(C) describes broad, wide-ranging conduct including: (1) transporting; (2) transferring, selling or otherwise disposing of; or (3) purchasing or receiving with intent to transport, transfer, sell, or otherwise dispose of two or more firearms. Under subsections (ii) and (iii), a person who attempts, conspires with, or induces another person to commit any of the above acts receives the enhancement. Here, the facts established by a preponderance of the evidence at the hearing fairly imply two sets of conduct: (1) Cole and Rakes agreed that Cole would transport two or more firearms to and from the gun range; and (2) Cole and Rakes agreed that Cole would possess the firearms at the gun range.[4] Neither the Government nor the Defendant

---

[4] The Government argues for a third finding: that Cole induced Rakes to commit one of the acts in subsection (i). Because the court can resolve the issue on the other findings, the Court need not delve further

point to any direct authority, either for or against, applying this enhancement in a case with this type of facts.

Cole argues that in either the transporting or possessing context, the enhancement should not apply to conduct of temporary or short-term duration. *See United States v. Jefferson*, 334 F.3d 670, 673–74 (7th Cir. 2003). In *Jefferson*, the Seventh Circuit grappled with the question of whether the term "otherwise dispose of" in 18 U.S.C. § 922(d) included the temporary transfer of a gun for safekeeping. There, Jefferson knew his brother, Melvin, was a felon. Yet Jefferson and Melvin went together to the gun store for Jefferson to buy two semi-automatic handguns. A week later, Jefferson gave one of the guns to his brother so that Melvin could keep it in his safe while Jefferson was out of town for a month. The gun remained with Melvin after Jefferson returned and then for the duration of a second trip. Jefferson was later indicted on one count of delivery of a firearm to a felon, 18 U.S.C. §922(d). At trial, the jury received an instruction that "the term 'dispose of' as used in the indictment means to transfer a firearm so that the transferee acquires possession of the firearm." *Id.* at 673. Jefferson was convicted and, on appeal, challenged the instruction.

In upholding Jefferson's conviction and the instruction, the Seventh Circuit stated, "[t]he core issue is the proper interpretation of 'dispose of.' Jefferson's argument here is that the temporary transfer of a gun for safekeeping, the extent of his admission, is not encompassed by the statutory language." *Jefferson*, 334 F.3d at 673. The panel noted that the district court's instruction was based on one given in *United States v. Monteleone,* 77 F.3d 1086, 1092 (8th Cir.

---

into this argument. The Government's theory throughout this case and Rakes's case has been that Rakes was a straw-purchaser for Cole in all three gun purchases. While the Court agrees with the Government that Rakes's credibility is questionable and that a likely scenario is that Cole did, in fact, use his influence over her to cause her conduct, the Court need not address this issue.

1996) (reversed on other grounds). In that case, Salvatore Monteleone had given his gun for repair to a half-brother whom he knew to be a felon, in a temporary transfer. The court, like in *Jefferson*, instructed the jury that the term "dispose of" means "to transfer a firearm so that the transferee acquires possession of the firearm." *Id.* The Eighth Circuit found that this definition was in accordance with the Supreme Court's decision in *Huddleston v. United States*, 415 U.S. 814, 823 (1974) (holding that the word 'acquisition,' as used in § 922(a)(6), is not ambiguous, but clearly includes "any person, by definition, who 'come[s] into possession, control, or power of disposal' of a firearm").

Although the Seventh Circuit upheld Jefferson's conviction, it noted skepticism of the Eighth Circuit's reliance on *Huddleston*. For this reason, the Seventh Circuit looked to legislative history:

> Legislative history pulls in both directions. The strongest evidence for the government comes from a source cited by the *Huddleston* court. According to *Huddleston,* the term "dispose" was first used in the National Firearms Act, Pub. L. No. 73–474, § 1(k), 48 Stat. 1236, 1237 (1934), which defined "to transfer" as "to sell, assign, pledge, lease, loan, give away, or otherwise dispose of." If we derived our construction from the 1934 law, therefore, disposal would encompass a wide range of transfers, both temporary and permanent (e.g., sell or lease) and both commercial and noncommercial (e.g., sell or give away). On the other hand, we may also consider the more recent history of § 922(d). Prior to 1986, § 922 only forbade sales and other dispositions to felons by licensed gun dealers. H.R. Rep. No. 99–495 at 15, *reprinted in* 1986 U.S.C.C.A.N. 1327, 1341. The Firearms Owners' Protection Act, § 102(5), Pub. L. No. 99–308, 100 Stat. 449, 451 (1986), broadened the statutory coverage to "close an existing loophole whereby qualified purchasers have acquired firearms from licensees on behalf of prohibited persons." H.R. Rep. No. 99–495 at 17, *reprinted in* 1986 U.S.C.C.A.N. 1327, 1343. The new § 922(d) "extend[ed] the prohibition which [applied] only to Federal firearms licensees to all persons who transfer a firearm." *Id.* at 22, 1348. There are two ways to interpret this broadening of the law. *The first possible interpretation is that the new language intends to forbid, for non-dealers, only actions that dealers usually engage in—commercial, permanent transfers. Or we can read the change to include under § 922(d) the wider range of transfers that a non-dealer might make (including gratuitous, temporary transfers). After all, there is no compelling reason to believe that, when the class of persons covered is broadened, the meaning of "sell or otherwise dispose of" should continue to reflect only the sorts*

> *of dispositions associated with the former and narrower class of persons covered…*
>
> *…Here, our best evidence of congressional intent is the legislative history cited above, which indicates that Congress wanted to broaden the reach of the gun control statute to cover a wider range of firearms transfers.* Given the potential breadth of the word "disposal," as contained in the 1934 National Firearms Act, we believe that Congress must have been aware that non-dealers may be equally likely to engage in gratuitous, temporary transfers (say, to family members or friends) as to engage in permanent, commercial transfers, and must have found both types of transfers potentially dangerous and undesirable. *To exclude such gratuitous, temporary transfers from the reach of § 922(d) also ill-serves the purposes of the statute—Congress presumably did not want guns in the hands of felons, whether on a temporary or permanent basis, whether for free or for payment.* If Congress really wanted to strengthen and broaden the reach of the firearms statute, it would not have distinguished between transfers made at arm's length for consideration and gratuitous transfers to friends or family members. We are not aware of a persuasive reason to make such a distinction.

*Jefferson,* 334 F.3d at 674-75 (emphasis added throughout). The Court then determined that "[g]iven the substantial duration of Jefferson's transfer to his brother and his brother's undisputed exclusive control over the firearm, we see no problem with the district courts' definition of 'dispose of,' . . . to transfer a firearm so that the transferee acquires possession of the firearm." *Id.* at 675. Cole reads this final sentence narrowly to mean that only transfers of a "substantial duration" fall within the definition of "dispose of."

Having reviewed *Jefferson*, the Court does not read its holding as narrowly as Cole. The Seventh Circuit acknowledged in its recitation of the legislative history that non-dealers may "be … likely to engage in gratuitous, temporary transfers (say, to family members or friends)" and that excluding such transfers "ill-serves the purposes of the statute." The same rationale applies here, especially in light of the Sentencing Commission's stated reason for amendment. In its history, the Commission specifies that this new subsection to U.S.S.G. § 2K2.1 was in direct response to §12004(a)(5) of the Bipartisan Safer Communities Act, Pub. L. No. 117-159 (the "Act"). Indeed, the Commission noted in its history that:

> New subsection (b)(5)(C) [now (b)(6)(C)] provides an increase for defendants who attempted, conspired, or engaged in conduct involving the illicit transfer of two or more firearms to a person who (i) had a prior conviction of a crime of violence, controlled substance offense, or misdemeanor crime of domestic violence; (ii) was under a criminal justice sentence at the time of the offense; or (iii) intended to use or dispose of the firearms unlawfully. The new subsection (b)(5)(C) increases the enhancement from four levels to five levels to ensure straw purchasers and firearms traffickers meeting these criteria receive increased penalties as required by the directive.
>
> *The Commission determined that the expanded specific offense characteristic at subsection (b)(5) fully implements the directive by ensuring that defendants who illegally transfer a firearm receive an increased penalty under the guidelines.* Specifically, the enhancement is tailored to apply to the most culpable defendants who engage in (a) straw purchasing, including those defendants who induce straw purchasing, and (b) firearms trafficking, including those defendants whose conduct was "upstream" in the gun trafficking pipeline. Consistent with the legislative history of the Act, public comment, and witness testimony, the Commission determined that such an increase is appropriate to reflect Congress's view that such conduct contributes to the illegal flow of firearms and that such defendants are currently under-punished as compared to felons in possession of the trafficked weapons. At the same time, by incorporating the elements of the core straw purchasing and firearms trafficking statutes, including the new offenses (sections 932 and 933), the new enhancement narrowly targets such defendants without also impacting other firearms defendants who were not intended to receive an increase.

https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf (emphasis added). Given this effort to expand, not retract, the conduct that could support the enhancement, the Court does not read the language as narrowly as Cole and finds that it applies to even temporary or short-term conduct.

A simple hypothetical brings home the point. Cole had possession of and was transporting three firearms. Anything could have transpired while those firearms were in his possession, even if he had them for only an hour. He could have passed them off to other prohibited persons, he could have used one or more in another offense, or, he could have just shown up at the gun range as planned. Apply the same hypothetical with his return home with the guns from the range. To read the enhancement as Defendant does suggests that Congress was more concerned with how

long the firearms stay with a prohibited person rather than the fact that they have them. In theory, savvy criminals don't possess contraband for long. And an enhancement that draws some arbitrary distinction about what is temporary possession would certainly undermine the intent of Congress that felons be permanently dispossessed of firearms. That just can't be the case.

Having said all this, the Court finds that the Government has met its burden of demonstrating the applicability of the five-level enhancement. Despite all the evidence taken and the back and forth about whether it shows inducement or straw purchases or any other conduct, the facts here are quite simple. Cole concedes in his brief: "there is no question Rakes allowed Cole to bring her the firearms from their home to the shooting range, and she intended that he returned them to the home. She knew he was a felon and that he had been convicted of a misdemeanor domestic battery. She allowed him to transport all 3 firearms on April 26, 2024." (Resp. at 13-14). Likewise, there is no question that there was some agreement between Cole and Rakes for him to bring the firearms to the gun range and transport them home. Under the guideline provisions then, Cole conspired with Rakes to transport or "otherwise dispose of" (defined by *Jefferson* as "possess") two or more firearms and the enhancement applies. Congress has clearly indicated its intent that it does not want prohibited persons having multiple firearms in their hands for any purpose – even temporary ones. This enhancement punishes that conduct. Defendant's objection is OVERRULED.

**2. <u>Obstruction of Justice Enhancement, U.S.S.G. §3C1.1</u>**

The Guideline calculation of Cole's offense level included a two-level obstruction of justice enhancement based on Cole's jail calls to Rakes directing her to lie to the Court to minimize his own conduct. As with the firearms trafficking enhancement, the Government bears the burden by a preponderance of the evidence. *Hines*, 449 F.3d at 815.

Sentencing Guideline § 3C1.1 provides for a 2-level increase in a defendant's offense level for obstructing or impeding the administration of justice if:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense....

U.S.S.G. § 3C1.1. The Application Notes to Guideline § 3C1.1 provide a non-exhaustive list of types of conduct to which the obstruction-of-justice enhancement applies. Chief among the types of conduct includes "suborning or attempting to suborn perjury." There's no question that Cole's jail calls attempted to influence Rakes to lie or mislead the Court as to her role in his possession of the three firearms. While ultimately Rakes made the wise decision not to mislead the Court, Cole's attempt to influence her testimony or statements to the Court is clear from the jail calls. *See United States v. Major*, 33 F.4th 370 (7th Cir. 2022) ("[A]n effort to influence a witness's testimony… is a prototypical example of obstruction of justice.") (quoting *United States v. Cheek,* 740 F.3d 440 (7th Cir. 2014). The Defendant's objection to the obstruction of justice enhancement is OVERRULED.

## CONCLUSION

Based on the above, the Court OVERRULES the Defendant's objections to the PSR. The Probation officer is DIRECTED to file an updated PSR reflecting the amendment to former U.S.S.G. §2K2.1(b)(5)(C), now §2K2.1(b)(6)(C) within seven (7) days. Sentencing shall be set by separate entry.

**SO ORDERED** this 2nd day of November, 2026.

s/Holly A. Brady

CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT